# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. ANTHONY WILLIAMS

**Appeal from the Criminal Court for Shelby County**
**No. 11-02277    J. Robert Carter, Judge**

_____

**No. W2012-00014-CCA-R3-CD  - Filed October 31, 2012**

_____

Following his Shelby County Criminal Court jury convictions of premeditated murder, felony murder, and especially aggravated robbery, for which he received an effective sentence of life imprisonment, the defendant, Anthony Williams, appeals to this court, challenging only the sufficiency of the evidence to support his convictions. Discerning no paucity in the evidence, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Harry E. Sayle III (on appeal), Memphis, Tennessee; Nigel Lewis and Timothy Albers, Assistant Public Defenders (at trial), for the appellant, Anthony Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; David Zak and Anita Spinetta, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On December 26, 2010, at approximately 1:00 p.m., the 20-year-old victim, Anthony Randle, bled to death on the floor of the Park Avenue Store after suffering multiple gunshot wounds on the sidewalk outside the front door. Surveillance cameras recorded the incident. Witnesses identified the defendant as the shooter.

Odester Smith, the victim's girlfriend, testified at trial that the victim left their home to go to the store "a little after noon or maybe around noon" on December 26, 2010. She said that the Park Avenue Store was located approximately two blocks from their home.

Later that afternoon, a neighbor told Ms. Smith that someone had been shot at the store, that he had seen the victim's bicycle at the scene, and that he hoped the victim had not been shot. Ms. Smith then learned that the victim had been shot and killed at the store.

Reginald Williams, the defendant's cousin, testified that he and the defendant made the 10-minute walk from Mr. Williams' home to the Park Avenue Store on the morning of December 26 to sell a cellular telephone. Mr. Williams recalled wearing a gray sweat suit. He said that the defendant wore jeans and a hooded jacket that day. Mr. Williams said the defendant approached "this dude [whose] name was Anthony too" to attempt to sell the cellular telephone. This individual, the victim, told the defendant and Mr. Williams that he was not interested in buying the cellular telephone. The three men then left the interior of the store.

Mr. Williams testified that, once outside the store, the victim offered to sell him and the defendant marijuana. Mr. Williams said he "looked at [the marijuana], and . . . kept on walking." As he walked away, Mr. Williams heard a gunshot. He then turned to see the victim and the defendant "tussling." Mr. Williams saw the defendant remove something from the victim's pocket and place it in his own pocket. Mr. Williams testified, "[T]hen [the defendant] said something to [the victim] and just shot him." Mr. Williams recalled hearing three or four gunshots. The victim then "fell to the ground," and the defendant "ran off." Mr. Williams testified he did not see the defendant again that day. He spoke to the police on December 27 and told them what he had witnessed.

On cross-examination, Mr. Williams admitted that he was unsure of the time of day when he and the defendant walked to the store. He did not know whether the victim had any weapons. He did not see any shots fired. He also did not hear any argument between the defendant and the victim. Mr. Williams worried that he would be implicated in the offenses, so he spoke to the police the day after the shooting. He testified that he had no idea that the defendant intended to rob or shoot anyone. Mr. Williams identified himself, the victim, and the defendant in photographs retrieved from the store's surveillance cameras. In one photograph, Mr. Williams is seen walking away from the victim and the defendant immediately before the shooting.

Lisa Barnes testified that she pulled into the parking lot of the Park Avenue Store at approximately 1:00 p.m. Her son, S.B.,[1] was seated in the front seat. As she parked, she saw three men outside, one "on the lot" away from two others who were standing "in front of the store" talking. She said that one of the men talking wore a "black hoodie." Ms. Barnes testified that initially nothing seemed unusual about the men, but she then heard the

---

[1] We will refer to any child witnesses by their initials.

man in the hooded jacket say "'give me that out your pocket'" in a "hostile" and "demanding" way. Ms. Barnes had just started walking toward the store entrance when she heard three or four gunshots coming from the direction of the two men. She immediately returned to her vehicle, and she then "put it in reverse and backed out of the drive." As she pulled away from the parking lot, Ms. Barnes saw the shooter run away, drop something, pick it up, and keep running. She turned around to see if the victim was okay. She saw the victim "l[]ying in the floor [of the store] in a puddle of blood." The police soon arrived. Ms. Barnes told them that she had seen everything because she had parked only 10 feet away from the altercation. Ms. Barnes left the store, however, without giving a statement because she was "so nervous" and "very upset." A few days later, she identified the defendant as the shooter from a photograph array.

On cross-examination, Ms. Barnes testified as to her certainty of her identification of the defendant. She said that she "saw his face" and witnessed "the roughness of how [the defendant] was handling the [victim]." She testified that she did not see the surveillance video before making her identification of the defendant at the police station. She also recalled that the man standing some distance from the shooting wore a gray sweat suit.

S.B., 14 years old at the time of the offenses, testified that he and his mother stopped at the Park Avenue Store after leaving church on December 26, 2010. As they entered the parking lot, he saw three men standing outside the store. As his mother exited their vehicle, he heard gunshots. His mother returned to the car quickly and left the parking lot. She then returned to the store. S.B. recalled seeing the victim "l[]ying down in a puddle of blood." Sometime after the incident, he viewed photograph arrays at the police station and identified the defendant and Mr. Williams as the two men standing outside the store when the victim was shot. He said that Mr. Williams wore gray on the day of the offense and that the defendant was the shooter. S.B. opined that the men "were trying to rob [the victim] or something." He testified that he saw the gun in the defendant's hands as the defendant fled the scene. S.B. also identified his mother's Ford Explorer in one of the photographs retrieved from the surveillance video.

F.M., 13 years old at the time of the offenses, testified that he saw a man in a black hooded jacket "pull out a gun and shoot [the victim]." F.M. spoke to the police at the scene. He also identified the defendant as the shooter from a photograph array a few days later. On cross-examination, F.M. reiterated that he had a clear view of the incident. He said that he saw the defendant's face and the gun, which he described as a nine millimeter handgun. He opined that the incident appeared to be "a drug deal" gone awry.

Oumer Oumer, an employee at the Park Avenue Store, testified that he "heard

a noise like a shot" and asked several customers whether anyone was setting off fireworks. Soon thereafter, however, he saw the victim "with a lot of blood coming from his mouth . . . open[] the door and . . . f[a]ll down on the floor." Mr. Oumer then "grabbed the phone and called 911." Mr. Oumer testified that both the victim and Mr. Williams were regular customers. He said that the store was equipped with multiple cameras that were always recording.

Memphis Police Department ("MPD") Officer Joseph Byers and his partner were the first to arrive on the scene of the shooting. He found the victim lying inside the doorway of the store with his feet pointing toward the door. He testified, "[W]hen we arrived [the victim] was giving his dying breath." Officer Byers did not interview any witnesses. He secured the scene and collected shell casings from the parking lot.

MPD Sergeant Chester Striplin retrieved the video surveillance recording from the store's system. He extracted still photographs and a digital video disc ("DVD") showing the incident. The jury viewed a DVD showing the victim's being shot and falling inside the doorway of the store.

MPD Crime Scene Investigator Eric Carlisle collected evidence at the scene. He found one spent bullet, two spent bullet fragments, and four spent .380 caliber Winchester casings near the area of the shooting. He did not, however, find any weapons.

MPD Crime Scene Investigator Sheila Wright photographed the scene. The photographs reveal the victim's bicycle, gloves, and blood in the area of the shooting. Investigator Wright's photographs also documented a trail of blood leading from the shooting area to the doorway of the store.

MPD Sergeant Michael A. Brown investigated the shooting. He testified that he located Mr. Williams via a Crime Stopper tip on December 27, 2010. Mr. Williams, S.B., F.M., and Ms. Barnes all identified the defendant as the shooter. Sergeant Brown testified that the media release of the surveillance video occurred after the witnesses identified the defendant.

Doctor Miguel Laboy, Assistant Medical Examiner for Shelby County, performed the autopsy of the victim. Doctor Laboy determined that the victim suffered three gunshots wounds: one to his left thigh, one to his left buttock, and one to his left shoulder. The shoulder wound proved fatal when the bullet perforated both lungs and exited on the right side of the victim's chest. Doctor Laboy recovered a "medium calibre [sic], slightly deformed bullet" from the victim's buttock. He testified that medium caliber ammunition is typically .38 caliber or nine millimeter. Having "received the [victim's] body nude," he

-4-

did not observe any stippling or soot on the victim's clothing. He determined the victim died from multiple gunshot wounds.

With this evidence, the State rested its case. The defendant moved for a judgment of acquittal, which the trial court denied. Following a full colloquy concerning his right to testify, *see Momon v. State*, 18 S.W.3d 159, 161-62 (Tenn. 1999), the defendant elected not to testify. He did, however, present testimony concerning an alibi.

Charles Everett Williams, the defendant's father, testified that he picked up the defendant at the defendant's maternal grandfather's home sometime after noon on December 26, 2010. He said that the defendant then visited family at his home "for awhile." He testified that the defendant appeared normal, not nervous, that day. On cross-examination, the witness admitted that he did not know the exact time he picked up the defendant. He also acknowledged that the defendant's grandfather's home was located approximately two to three miles from the Park Avenue Store.

With this evidence, the jury convicted the defendant, as charged, of one count of premeditated murder, one count of felony murder, and one count of especially aggravated robbery. At sentencing, the trial court merged the first degree murder counts and entered a single judgment of conviction sentencing the defendant to life in prison with the possibility of parole. The trial court ordered the defendant to serve a concurrent sentence of 15 years for the especially aggravated robbery conviction. Following the denial of a timely filed motion for new trial, the defendant filed a timely notice of appeal to this court.

On appeal, the defendant challenges the sufficiency of the evidence to support his convictions. He argues that the evidence of his alibi undermines the verdict in this case. The State argues that the jury accredited the testimony of the State's witnesses and that, therefore, the evidence is sufficient to support the convictions. Following our review, we agree with the State.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-

weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

We need not labor long over the defendant's argument that the State failed to establish his identity as the shooter. Four witnesses identified the defendant as the shooter in this case. Photographic evidence obtained from the store surveillance cameras shows a man fitting each witness's description struggling with the victim and the victim's lying dead in the doorway of the store. By their verdict, the jury chose to accredit the testimony of these witnesses, as was their province to do. Likewise, by their verdict, the jury did not accredit the testimony of the defendant's alibi witness. The evidence overwhelmingly established the defendant's convictions of first degree murder and especially aggravated robbery.

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-6-